******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# ROBERT S. WALTON IV *v.* DEEPA B. WALTON
## (AC 45791)

Bright, C. J., and Elgo and Cradle, Js.

*Syllabus*

The defendant appealed to this court from the judgment of the trial court dissolving her marriage to the plaintiff and finding her in contempt for various violations of the court's automatic orders and pendente lite orders. During the pendency of the underlying action, the defendant executed a separation agreement with her employer and, approximately two weeks later, the parties signed a pendente lite agreement that provided, inter alia, that the defendant would pay the first mortgage on the marital residence and automobile insurance premiums. The defendant subsequently withdrew almost $80,000 from her retirement accounts, which was not fully accounted for at the time of trial, and received more than $70,000 from her parents, which she used to pay off her personal credit card debt. The defendant also removed the plaintiff as an insured from the parties' automobile insurance policies and an umbrella policy covering the parties' vehicles and the marital residence, which were in place at the time the dissolution action was commenced. The defendant stopped making the monthly mortgage payments, and she sought and obtained a deferral of the mortgage payments in the amount of $87,961.45 without the written consent of the plaintiff or an order of the court. Two days before the final day of trial, the trial court denied the defendant's request for production of an appraisal of the marital residence completed by an independent appraiser, C, retained by the plaintiff. *Held*:

1. The defendant could not prevail on her claim that the trial court improperly granted the plaintiff's motion for contempt alleging that the defendant violated the automatic orders when she removed the plaintiff as an insured under the parties' insurance policies: this court rejected the defendant's argument that the automatic orders did not clearly and unambiguously pertain to the umbrella policy, as the umbrella policy was, in substance, a policy that covered the parties' automobiles and marital residence; moreover, the trial court did not credit the defendant's testimony that she did not intend to remove the plaintiff from the automobile policies at issue but that she did so accidentally, nor was it required to do so.

2. This court could not conclude that the trial court abused its discretion in finding the defendant in contempt for failing to pay the mortgage on the marital residence: the defendant entered the pendente lite stipulation assuming the responsibility of the mortgage payment with knowledge of her employment situation, she clearly knew that deferring the payments would increase the amount of marital debt, and she impermissibly

resorted to self-help to avoid paying the mortgage on the marital residence as ordered by the trial court; moreover, even if the defendant believed that the deferral excused her from paying the mortgage, a good faith dispute does not preclude a finding of wilfulness; furthermore, the funds that the defendant withdrew from her retirement accounts and that she received from her parents could have been used to pay the mortgage on the marital residence, but she chose not to do so.

3. The defendant could not prevail on her claim that the trial court improperly granted the plaintiff's motion for contempt alleging that she violated the automatic orders when she withdrew funds from her retirement accounts: although the defendant testified that she made the withdrawals from her retirement accounts in order to pay necessary bills, her claim of necessity was undermined by the availability of the funds that she received from her parents, which she could have put toward uses other than paying off individual credit card debt, and the defendant's argument that the court erred by not considering the exception to the automatic order prohibiting the disposition of marital funds during the pendency of the dissolution action for the payment of household expenses was therefore unavailing; moreover, because the trial court determined that the defendant's violation of the automatic orders was wilful, this court could not conclude that the trial court abused its discretion by finding the defendant in contempt for withdrawing funds from her retirement accounts.

4. The defendant could not prevail on her claim that the trial court improperly awarded the plaintiff his entire federal pension without assigning a value to it or recognizing that it had value and that it did not properly consider and weigh the pension's value when formulating its property distribution orders: neither party presented evidence as to the value of the plaintiff's pension in the form of expert testimony or otherwise, and it is not the function of the court to make calculations of that sort to fill evidentiary gaps; moreover, the defendant's claim that the court failed to consider the pension was without merit, as the court clearly classified and weighed it as a marital asset when it expressly ordered that the plaintiff retain his entire federal pension, and there was nothing in the record to suggest that the court did not consider the value of the pension when it divided the parties' assets.

5. The defendant could not prevail on her claim that the trial court improperly denied her request for production of the appraisal prepared by C; on appeal, the defendant failed to challenge the basis of the trial court's ruling, namely, that the appraisal was not subject to disclosure under the rule of practice (§ 13-4 (f)) because the plaintiff had not disclosed C as an expert witness, he was not seeking to introduce the appraisal into evidence, and the defendant had not shown any exceptional circumstance indicating that it was impracticable for her to obtain the facts or opinions contained in the appraisal by other means.

6. The defendant could not prevail on her claim that the trial court improperly distributed the parties' property in a disproportionate and inequitable manner: because the court specified in its memorandum of decision that it considered the criteria set forth in the statute (§ 46b-81) governing property distribution in marital dissolution actions and the evidence before it, it was presumed to have properly performed its duty in distributing the marital estate, and, given the entire mosaic of the court's judgment, the court did not abuse its discretion with respect to the division of the marital estate; moreover, although the defendant argued that she did not receive any of the parties' retirement funds, the defendant ignored the fact that she did, in fact, receive a large portion of her retirement funds when she unilaterally withdrew funds from her retirement accounts, and it was not improper or inequitable for the court to strive to offset the defendant's earlier withdrawals; furthermore, the court reasonably exercised its discretion in ordering that the proceeds of the sale of the marital residence be split equally in light of the funds initially provided by the plaintiff for the purchase of the marital home and the defendant's unilateral decision to defer a significant amount of mortgage payments; additionally, the defendant's argument that the court inequitably ordered her to pay the remaining debt on the parties' two joint credit card accounts was unavailing, as the plaintiff's payments toward the accounts pursuant to the pendente lite orders significantly reduced the parties' joint debt.

Argued April 22—officially released August 13, 2024

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the plaintiff filed motions for contempt; thereafter, the case was tried to the court, *Kowalski, J.*; judgment granting the plaintiff's motions for contempt and dissolving the marriage and granting certain other relief, from which the defendant appealed to this court. *Affirmed.*

*Brandon B. Fontaine*, with whom, on the brief, was *Meaghan E. Collins*, for the appellant (defendant).

*Adam J. Teller*, for the appellee (plaintiff).

*Opinion*

CRADLE, J. The defendant, Deepa B. Walton, appeals from the judgment of the trial court dissolving her marriage to the plaintiff, Robert S. Walton IV. On appeal,

the defendant claims that the court improperly (1) found her in contempt for various alleged violations of the court's automatic and/or pendente lite orders, (2) awarded the plaintiff his entire federal pension without assigning a value to it, (3) denied her request for production of an appraisal completed by an appraiser retained by the plaintiff, and (4) distributed the parties' property in a disproportionate and inequitable manner. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our review of the claims on appeal. The parties were married in 2003 and three children were born of the marriage.[1] On October 9, 2019, the plaintiff filed the present dissolution action against the defendant. Along with the writ, summons and complaint, the defendant also was served with the automatic orders in accordance with Practice Book § 25-5 (service of automatic orders is "made with service of process of a complaint for dissolution of marriage").[2]

---

[1] The parties entered into a parenting plan governing the care and custody of the minor children. The care and custody of the minor children is not at issue on appeal.

[2] Practice Book § 25-5 provides in relevant part: "The following automatic orders shall apply to both parties, with service of the automatic orders to be made with service of process of a complaint for dissolution of marriage . . . . The automatic orders shall be effective with regard to the plaintiff . . . upon the signing of the complaint . . . and with regard to the defendant . . . upon service and shall remain in place during the pendency of the action, unless terminated, modified, or amended by further order of a judicial authority upon motion of either of the parties:

\* \* \*

"(b) In all cases involving a marriage . . . whether or not there are children:

"(1) Neither party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action.

\* \* \*

"(6) Neither party shall cause the other party to be removed from any medical, hospital and dental insurance coverage, and each party shall main-

On December 16, 2019, the parties signed a pendente lite agreement, which was entered as an order of the court, providing, inter alia, that the plaintiff would make the monthly payments due on six credit card accounts, two of which were joint accounts, and the defendant would pay the first and second mortgages on the marital residence, in addition to various other expenses associated with the marital residence, automobile insurance, taxes, registration and life insurance premiums.

During the pendency of the action, the parties filed various motions for contempt alleging violations of the automatic orders and/or pendente lite orders. Those motions, as discussed more fully herein, were reserved until the time of trial. The action was tried to the court on December 1 and 2, 2021, and April 13, 2022. The court heard testimony from both parties and numerous exhibits were introduced into evidence. The parties both presented expert testimony as to the value of the marital residence. The parties also submitted evidence on five outstanding motions for contempt filed by both parties.[3]

On September 6, 2022, the court issued a memorandum of decision rendering judgment dissolving the parties' marriage. The court also granted three motions for

---

tain the existing medical, hospital and dental insurance coverage in full force and effect.

\* \* \*

"(d) The automatic orders of a judicial authority as enumerated above shall be set forth immediately following the party's requested relief in any complaint for dissolution of marriage  .  .  .  and shall set forth the following language in bold letters:

**"Failure to obey these orders may be punishable by contempt of court. If you object to or seek modification of these orders during the pendency of the action, you have the right to a hearing before a judge within a reasonable time**.

"The clerk shall not accept for filing any complaint for dissolution of marriage  .  .  .  that does not comply with this subsection." (Emphasis in original.)

[3] As indicated herein, this appeal involves only three of the motions for contempt filed by the plaintiff. Neither party challenges the court's rulings on the other two contempt motions.

contempt filed by the plaintiff that are at issue in this appeal, finding, inter alia, that the defendant wilfully violated the clear and unambiguous automatic orders and/or pendente lite orders by removing the plaintiff as an insured from automobile insurance policies and an umbrella policy covering the parties' vehicles and the marital residence, failing to pay the mortgages on the marital residence and withdrawing funds from her retirement accounts. The court indicated that it would take the defendant's contumacious actions into account when fashioning its financial orders. As to the distribution of marital property, the court ordered, inter alia, that the marital residence be listed for sale by October 1, 2022, and that the proceeds from that sale be split equally by the parties. The court ordered that the plaintiff retain 100 percent of his retirement accounts and awarded the plaintiff the funds remaining in the defendant's retirement accounts. The court further ordered that each party retain title and interest to his or her sole checking accounts, brokerage accounts and funds held in escrow, as reflected on their most recent financial affidavits. The court ordered that the parties would be solely liable for the debts and liabilities listed on their respective financial affidavits, except that the defendant would be responsible for paying the balances on the parties' joint credit card accounts. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We begin with the defendant's claims concerning the trial court's granting of three motions for contempt filed by the plaintiff, alleging violations of the automatic orders and/or pendente lite orders.[4] The following legal principles are applicable to our consideration of the

---

[4] For ease of discussion, we address the defendant's claims in a different order than they are presented in her appellate brief.

defendant's claims. "Contempt is a disobedience to the rules and orders of a court which has power to punish for such an offense. . . . [C]ivil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts. . . . In part because the contempt remedy is particularly harsh . . . such punishment should not rest upon implication or conjecture, [and] the language [of the court order] declaring . . . rights should be clear, or imposing burdens [should be] specific and unequivocal, so that the parties may not be misled thereby. . . . To constitute contempt, it is not enough that a party has merely violated a court order; the violation must be wilful. . . . It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive. . . . The question of whether the underlying order is clear and unambiguous is a legal inquiry subject to de novo review. . . . If we answer that question affirmatively, we then review the trial court's determination that the violation was wilful under the abuse of discretion standard." (Internal quotation marks omitted.) *Wethington* v. *Wethington*, 223 Conn. App. 715, 723, 309 A.3d 356 (2024).

In considering the defendant's claims, we also are mindful that "[a] party to a court proceeding must obey the court's orders unless and until they are modified or rescinded, and may not engage in self-help by disobeying a court order to achieve the party's desired end. . . . The principle against self-help often applies in situations in which previously compliant parties stopped complying with court orders after changes in circumstances rendered the orders unclear without first seeking judicial clarification or modification. . . . [A]lthough contempt is particularly harsh, a good faith

dispute or legitimate misunderstanding does not preclude a finding of wilfulness as a predicate to a judgment of contempt." (Citations omitted; internal quotation marks omitted.) *Birkhold* v. *Birkhold*, 343 Conn. 786, 813, 276 A.3d 414 (2022).

Here, the court found, as a preliminary matter, that the automatic orders and the pendente lite orders were clear and unambiguous and that the parties had notice of those orders. The court further found that both parties are attorneys, and the defendant testified that she read and understood the automatic orders after being served with them on October 4, 2019. With the foregoing in mind, we address the defendant's challenges to each of the court's contempt findings in turn.

A

On January 30, 2020, the plaintiff filed a motion for contempt alleging that the defendant violated the automatic orders when she removed the plaintiff as an insured under the parties' automobile insurance policies and an umbrella policy covering the parties' vehicles and the marital residence, which were in place at the time this action was commenced. In addressing the plaintiff's motion, the court first noted that the automatic orders provide, in part, that "each party shall maintain the existing life insurance, automobile insurance, homeowners or renters insurance policies in full force and effect." The court found that "[t]he defendant testified that, on November 1, 2019, she called the parties' insurance carrier in an effort to reduce the cost of the insurance premiums. The defendant removed the plaintiff from those policies. Following that call, some coverage was terminated, including automobile coverage on the Land Rover then being driven by the plaintiff, the jointly owned Mercedes automobile, and the plaintiff's interest in an umbrella policy. After the filing of the present motion, the defendant reinstated the coverage.

The plaintiff has established by clear and convincing evidence that the defendant wilfully violated the automatic orders by terminating the plaintiff's insurance coverage; however, the plaintiff failed to establish the amount of damages suffered as a result. Indeed, the defendant testified that the plaintiff withdrew $200 from a joint bank account and unilaterally withheld $600 in child support payments to make himself whole for the losses he may have suffered.''

On appeal, the defendant argues that the automatic orders were not clear and unambiguous in that they do not specifically mention umbrella insurance. Although the policy at issue is titled an umbrella policy, it is, in substance, a policy that covers the parties' automobiles and marital residence. We therefore reject the defendant's argument that the automatic orders did not clearly and unambiguously pertain to the umbrella policy.

The defendant also argues that she did not intend to remove the plaintiff from the automobile policies at issue but that she did so accidentally when she tried to reduce the umbrella coverage. The trial court apparently did not credit the defendant's testimony in this regard, nor was it required to do so. See *Delena* v. *Grachitorena*, 216 Conn. App. 225, 231, 283 A.3d 1090 (2022) (''[i]t is the exclusive province of the trier of fact to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony'' (internal quotation marks omitted)). Accordingly, the defendant's challenge to the court's finding of contempt for removing the plaintiff from the insurance policies at issue fails.

B

On August 21, 2020, the plaintiff filed a motion for contempt alleging that the defendant failed to pay the

mortgage on the marital residence as required by the December 16, 2019 pendente lite orders.[5] In addressing this motion, the trial court found that "[t]he defendant testified that she stopped making the monthly mortgage payments in May, 2020, and the evidence establishes that the defendant sought and obtained a deferral of the mortgage payments in the amount of $87,961.45 without the written consent of the plaintiff or an order of the court. The defendant filed no motion to modify [the pendente lite orders] but testified that she sought and obtained the deferral because she was unemployed and having a difficult time finding employment. Specifically, the defendant testified that she lost her job in December, 2019, which led to a period of unemployment.

"In reality, the defendant's last day at work was November 15, 2019, and she executed a separation agreement with her employer at the time on December 3, 2019.[6] This chronology is relevant because on December 16, 2019, when the parties presented their pendente lite stipulation . . . to the court for approval, the defendant did not disclose to the court or to the plaintiff the status of her employment, yet she made the decision to assume the financial obligations listed in the stipulation, which was made an order of the court . . . with full knowledge of her employment [situation]. There is no evidence before the court that the defendant has paid down any portion of the $87,961.45 deferral amount; rather, that deferral amount must be paid off

---

[5] As noted herein, the pendente lite orders required the defendant to pay the first and second mortgages on the marital residence. The record reflects that the motion for contempt pertained only to the first mortgage. Therefore, any reference to the mortgage in this context refers to the first mortgage on the marital residence.

[6] "The defendant also testified that part of the reason she lost her job in December, 2019, was due to 'impending COVID.' The court does not find this testimony credible."

as a balloon payment at the end of the mortgage term or earlier payoff.

"The court sympathizes with the difficult financial circumstances facing the defendant in the spring and summer of 2020. Nevertheless, the plaintiff has established by clear and convincing evidence that the defendant wilfully violated the order of the court . . . when she deferred the mortgage payments that she was required to make during the pendency of this action. The court will take this reduction into account when fashioning its financial orders in the judgment." (Footnote in original.)

On appeal, the defendant argues that she did not violate the order that she pay the mortgage on the marital residence because no payments were due in that she had them deferred. The defendant's argument is belied by the language of the order, which provides only that the defendant shall pay the mortgage on the marital residence, not that she could unilaterally enter into an agreement to defer those payments. To begin, we emphasize the court's finding that the defendant entered the pendente lite stipulation assuming the responsibility of the mortgage payment with knowledge of her employment situation. Moreover, as the trial court found, the defendant clearly knew, as an attorney, the effect of deferring the payments, which was to increase the amount of marital debt. If she was having difficulty paying the mortgage, the proper recourse would have been to seek judicial clarification or modification. For instance, the defendant could have moved to modify the pendente lite order or could have sought approval of the deferral agreement, but she did not do so. Instead, she impermissibly resorted to self-help to avoid paying the mortgage on the marital residence as ordered by the court. Additionally, as stated herein, even if the defendant believed that the deferral excused her from paying the mortgage, a good faith dispute does

not preclude a finding of wilfulness. See *Birkhold* v. *Birkhold*, supra, 343 Conn. 813.

The defendant further contends that "[the court's] findings seem to suggest that [she] has a justified inability to comply with the financial orders on income alone." The court's finding that the defendant wilfully violated the pendente lite orders belies the defendant's contention. As discussed subsequently, while this action was pending, the defendant withdrew almost $80,000 from her retirement accounts and she received more than $70,000 from her parents, which she could have used to pay the mortgage on the marital residence, but she chose not to do so.[7] Therefore, we cannot conclude that the court abused its discretion in finding the

[7] On August 21, 2020, the plaintiff also filed a motion for contempt, pendente lite, in which he alleged that the defendant violated the automatic orders when she paid off $86,142.39 of her personal credit card debt using funds given to her by her parents during the pendency of this action. Although the court did not find the defendant in contempt for using the funds from her parents to pay her personal credit card debt, and the plaintiff has not challenged that ruling on appeal, the court's findings that those funds were available to her to pay other expenses in accordance with the automatic orders and pendente lite orders give context to certain of its other rulings.

Specifically, in addressing this motion for contempt, the court found: "The defendant's November 22, 2019 financial affidavit (#104.00) lists a total of $55,376 in individual credit card and tax debt. The defendant's August 6, 2020 financial affidavit (#129.00) lists zero in individual credit card and tax debt. At trial, the defendant testified that, during the pendency of this action, her parents gave her funds in excess of $70,000 that she used [to pay] off certain personal credit card debt. The defendant testified that those funds were a gift from her parents, which she has no expectation of repaying and that she has communicated that to her parents. The court finds the defendant's testimony on this issue to be credible and further finds that the plaintiff has failed to establish, by clear and convincing evidence, a wilful violation of the automatic orders on the part of the defendant by using the funds gifted to her by her parents to pay off her individual credit card and other debt." (Footnote omitted.)

The court further found that "[t]he defendant testified as to six different credit card balances, totaling $70,144.63, that were paid using funds from her parents. The defendant also testified that between December, 2019, and January, 2021, her parents made her monthly credit card payments on her behalf."

defendant in contempt for failing to pay the mortgage on the marital residence.

C

Also on August 21, 2020, the plaintiff filed a motion for contempt alleging that the defendant violated the automatic orders when she withdrew funds from her retirement accounts. In addressing this motion, the court first noted that "[t]he automatic orders provide, in part, that '[n]either party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action.' " The court found that "[t]he defendant's financial affidavit . . . filed November 22, 2019, reflects a $42,619 value for the defendant's Roth IRA and a $44,812 value for the defendant's 401 (k). Both accounts had a combined total of $87,431. When the defendant filed her next financial affidavit . . . on August 6, 2020, however, the Roth IRA had a zero balance and the 401 (k) had a balance of $15,000. The defendant's most recent financial affidavit . . . reflects values of $1000 for the Roth IRA and $30,000 for the 401 (k). The defendant's federal tax returns indicate that she took early IRA withdrawals of $39,459 in 2019 and $39,000 in 2020.

"The defendant does not dispute that she made the foregoing withdrawals from her retirement accounts without the written consent of the plaintiff or an order of the court but testified that she had to do so in order to pay necessary bills. The court need not repeat its findings with respect to the chronology of the defendant's unemployment, or that the defendant's parents paid off more than $70,000 in the defendant's personal credit card debt during the pendency of this action, but

suffice it to say that the availability of that $70,000, which the defendant could have put toward uses other than paying off individual credit card debt, undermines her claim of necessity.

"The plaintiff has established by clear and convincing evidence that the defendant wilfully violated the automatic orders by withdrawing $78,459 from her retirement accounts during the pendency of this action, which has also reduced the assets available for division between the parties. The court will take this reduction into account when fashioning its financial orders in the judgment."

On appeal, the defendant argues that the court failed to take into account the exception to the automatic order prohibiting the disposition of marital property during the pendency of the dissolution action, namely, that the order prohibits disposition "except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action." The defendant contends that the court erred in finding her in contempt because she used the funds that she withdrew for usual household expenses and attorney's fees. Although the defendant testified that she needed to withdraw those funds from her retirement accounts, the court rejected "her claim of necessity" on the ground that she could have used the $70,000 that she received from her parents to pay those expenses instead of using that money to pay off her personal credit card debt. The defendant's argument that the court erred by not considering the exception to the disposition of marital funds for the payment of household expenses is unavailing.

The defendant also cursorily contends that "the plaintiff failed to prove wilfulness in light of the court's findings about the defendant's financial difficulties." As stated herein, this interpretation of the court's findings

is unpersuasive considering the court's determination that the defendant's violation of the automatic orders was wilful. Accordingly, we cannot conclude that the court abused its discretion by finding the defendant in contempt for withdrawing funds from her retirement accounts.

## II

As to the distribution of marital property, the defendant first claims that the court improperly awarded the plaintiff his entire federal pension without assigning a value to it. She further argues that, "[e]ven if the court could not specifically value the pension, it failed to recognize that it had value and did not properly consider and weigh the pension's value when formulating its property distribution orders." We are not persuaded.

"We review financial awards in dissolution actions under an abuse of discretion standard. . . . In order to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Ingles* v. *Ingles*, 216 Conn. App. 782, 794–95, 286 A.3d 908 (2022).

"It is well settled that pension benefits constitute property subject to equitable distribution under [General Statutes] § 46b-81.[8] . . . Pension benefits constitute a form of deferred compensation for services rendered. . . . Pension benefits are widely recognized as

---

[8] General Statutes § 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint under section 46b-45, the Superior Court may assign to either spouse all or any part of the estate of the other spouse. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either spouse, when in the judgment of the court it is the proper mode to carry the decree into

among the most valuable assets that parties have when a marriage ends. . . . Nevertheless, there is no set formula that a court must follow when dividing the parties' assets, including pension benefits." (Citations omitted; footnote added; footnote omitted; internal quotation marks omitted.) Id., 803–804.

Our Supreme Court has noted that, "although not expressly required by statute, a trial court, when utilizing a method to ascertain the value of a pension, should reach that value on the record." *Krafick* v. *Krafick*, 234 Conn. 783, 804, 663 A.2d 365 (1995). Our Supreme Court also has recognized that "[t]he court need not, however, assign specific values to the parties' assets." *Bornemann* v. *Bornemann*, 245 Conn. 508, 531, 752 A.2d 978 (1998). Moreover, the Supreme Court has held that, "when neither party in a dissolution proceeding chooses to introduce detailed information as to the value of a given asset, neither party may later complain that it is not satisfied with the court's valuation of that asset." Id., 535. "If the parties fail to [provide the court with the approximate value of each asset], the equitable nature of the proceedings precludes them from later seeking to have the financial orders overturned on the basis that the court had before it too little information as to the value of the assets distributed." Id., 536.

Here, the defendant cannot assert that the court improperly failed to assign a specific value to the plaintiff's federal pension given the scant evidence of valua-

effect. . . .

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

tion presented by the parties.[9] On the plaintiff's November 29, 2021 financial affidavit, the plaintiff did not list a value associated with his federal pension but noted a gross monthly benefit at age 58.7 of $2847.[10] Despite the defendant's contention in her brief to this court that the plaintiff's federal pension "is likely the most valuable asset of the marriage," the defendant made no inquiry into its value at trial, nor did she ask the court in her written proposed orders to award any portion of it to her. Indeed, neither party presented evidence as to the value of the plaintiff's pension, in the form of expert testimony or otherwise, and "[i]t is not the function of the court to make calculations of that sort to fill evidentiary gaps." *Mongillo* v. *Mongillo*, 69 Conn. App. 472, 481, 794 A.2d 1054, cert. denied, 261 Conn. 928, 806 A.2d 1065 (2002).

The defendant nevertheless argues that, "[e]ven if a precise valuation was not possible, the error came from the court not considering and weighing the pension's clear significance." She contends that "the court failed to sufficiently recognize that the pension had meaningful value and weigh that in its property distribution." At oral argument before this court, her counsel reiterated that the court erred by not stating that the plaintiff's pension had "significant value." We are not persuaded.

[9] The defendant's counsel conceded at oral argument before this court that the trial court was not required to assign a specific value to the plaintiff's pension.

[10] The plaintiff testified that "the pension is . . . an estimate of what I will get when I . . . retire. . . . [W]e attempted to have the agency extrapolate what that value may be as of the date listed on the affidavit, which was a very difficult number to get them to do actually . . . [because] they usually don't tell you what your pension will be if you're forty-three years old and if you retire at age fifty-five and what can we somehow extrapolate your pension would be per month and some date in the future. They really don't do that. There's no statement that they provide for you to do this. But I, after a lot of research, found a technician who is able to contact someone, who was able to do it, and it was a long process. . . . So, it's not a number that is, was easily obtainable."

First, the defendant's claim that the court failed to consider the pension is without merit. In expressly ordering that the plaintiff retain his entire federal pension, the court classified and weighed it as a marital asset and then divided the marital assets in accordance with its broad discretion under § 46b-81.[11] Second, there is nothing in the record to suggest that the court did not consider the value of the pension. The plaintiff testified as to the current projection of the amount he would receive upon retirement and the record does not reflect that the court disregarded this evidence when it divided the parties' assets. In sum, the defendant has not demonstrated any error by the court, and we will not presume one. Consequently, the defendant's claim that the court improperly awarded the plaintiff his entire federal pension without assigning a value to it is unavailing.

## III

The defendant also challenges the court's finding as to the value of the marital residence. Specifically, the defendant argues that the court improperly denied her request for production of an appraisal of the marital residence, prepared by a certified appraiser at the behest of the plaintiff in the middle of trial, on the ground that it was protected from disclosure pursuant to Practice Book § 13-4 (f). We disagree.

The following additional procedural history is relevant to our consideration of this claim. On June 11,

---

[11] In support of her argument that the court improperly failed to weigh the plaintiff's pension in fashioning its financial orders, the defendant relies on *Dinunzio* v. *Dinunzio*, 180 Conn. App. 64, 182 A.3d 706, cert. denied, 328 Conn. 930, 182 A.3d 1193 (2018). The present case is easily distinguishable from *Dinunzio*, in which this court reversed the judgment of the trial court on the ground that it improperly classified the plaintiff's pension in that case only as a source of income and not as property subject to equitable distribution. Id., 75. Here, the trial court clearly treated the plaintiff's pension as property subject to distribution and expressly awarded it to the plaintiff.

2021, the plaintiff filed a disclosure of expert witness pursuant to Practice Book § 13-4[12] stating his intention to introduce at trial the testimony of James B. Hoffman, who would testify, on the basis of his "[k]nowledge of the neighborhood of the real property and analysis of the sales prices of comparable properties whose sales closed in the past year," that the fair market value of the marital residence as of June 9, 2021, was $1,500,000.

On June 18, 2021, the defendant filed a disclosure of expert witness pursuant to Practice Book § 13-4 stating her intention to introduce at trial the testimony of James J. Tooher, who would testify, on the basis of his expertise as a senior residential appraiser, that the fair market value of the marital residence as of June 9, 2021, was $1,160,000.

On November 30, 2021, the defendant filed a motion in limine seeking to preclude the testimony of Hoffman on the ground that "he is not an expert and [his testimony is] irrelevant for trial purposes and will not provide competent evidence on which the court can rely."

---

[12] Practice Book § 13-4, titled "Experts," provides in relevant part: "(a) A party shall disclose each person who may be called by that party to testify as an expert witness at trial . . . .

"(b) A party shall file with the court and serve upon counsel a disclosure of expert witnesses which identifies the name, address and employer of each person who may be called by that party to testify as an expert witness at trial, whether through live testimony or by deposition. In addition, the disclosure shall include the following information:

"(1) . . . [T]he field of expertise and the subject matter on which the witness is expected to offer expert testimony; the expert opinions to which the witness is expected to testify; [and] the substance of the grounds for each such expert opinion . . . .

"(3) . . . [T]he party disclosing an expert witness shall, upon the request of an opposing party, produce to all other parties all materials obtained, created and/or relied upon by the expert in connection with his or her opinions in the case within fourteen days prior to that expert's deposition . . . .

"(c) (1) Unless otherwise ordered by the judicial authority upon motion, a party may take the deposition of any expert witness disclosed pursuant to subsection (b) of this section . . . ."

The defendant argued, inter alia, that Hoffman was not a qualified expert because he is a real estate broker, not a licensed appraiser. The court heard argument of the parties on the first day of trial, after which it denied the defendant's motion, explaining that, although it was "not convinced that [Hoffman's testimony was] going to be that helpful," his qualifications would pertain to the weight that the court would afford his testimony, not its admissibility. Due to illness, Hoffman was not available to testify in December, but Tooher testified on the second day of trial, December 2, 2021.[13]

On January 24, 2022, the plaintiff filed a motion seeking access to the marital residence to permit an appraiser that he had retained to perform an appraisal of the property. In his motion, the plaintiff indicated that he had "engaged an independent real estate appraiser in lieu of the previously planned expert on the real estate value because the court's trial schedule created the opportunity and the court expressed some skepticism about the weight to be given the witness." The plaintiff indicated that the independent appraiser, Stephen Correll, "would provide the written report within seven days [and] [t]his time frame would provide an opportunity for the defendant's counsel to depose [Correll] if she chooses to do so." The court granted the plaintiff's motion.

On April 11, 2022, the defendant filed with the court a notice of service upon the plaintiff of a request to produce at the next trial date the appraisal completed by Correll. On April 13, 2022, the parties and counsel appeared before the court for the third and final day of trial. At the beginning of the proceedings that day, counsel for the defendant indicated to the court that she had sent to counsel for the plaintiff a request for

---

[13] The third and final day of trial originally was scheduled for December 3, 2021, but was rescheduled for April 13, 2022.

a copy of Correll's appraisal.[14] Counsel for the plaintiff stated that he objected to the defendant's request for production in that the appraisal was not subject to disclosure under Practice Book § 13-4 (f)[15] because he had not disclosed Correll as an expert witness and was not seeking to introduce the appraisal into evidence, and the defendant had not shown any exceptional circumstance indicating that it was impracticable for her to obtain the facts or opinions contained in the appraisal by other means. After confirming with the plaintiff's counsel that it was not his intention to call Correll as an expert witness or introduce the appraisal into

[14] Counsel for the defendant addressed the court as follows: "I have one preliminary discovery request, Your Honor, if I may. . . . I filed a request to produce on or about February 16th upon plaintiff's counsel, requesting an apprais[al] or any valuations reached predicated on Stephen Correll's inspection of the home. The court will remember in January of 2022, [the] plaintiff urgently requested from the court that [Correll] inspect the exterior and interior of the home. My client, of course, obliged the court order by two o'clock that day. . . . And we would like receipt of that—of Mr. Correll's valuation and have requested it."

After counsel for the plaintiff indicated his objection based upon Practice Book § 13-4 (f), counsel for the defendant responded: "Your Honor, if you will, I don't think it has been established that it is work product. And, in fact, I even requested any retainer agreements to ascertain who the contract was between, whether it was the plaintiff or plaintiff's counsel's firms. Additionally, Your Honor, in their urgent notice of January 23rd request to the court, for which no request came prior to that, they say that this man is going to be used in lieu of the previous planned expert. Additionally, Your Honor, it says that the appraiser would provide the written report within seven days. Whether it's ultimately—that did not occur. And whether it's ultimately entered as an exhibit is up to the safeguards of the court. The discovery phase for which I requested for is left up to my discretion at this time prior to introducing it, if at all."

The foregoing constitutes the entirety of the defendant's argument before the trial court in support of her request for the appraisal.

[15] Practice Book § 13-4 (f) provides: "A party may discover facts known or opinions held by an expert who had been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial only as provided in Section 13-11 or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."

evidence, the court asked counsel for the defendant to respond to the argument asserted by counsel for the plaintiff. Counsel for the defendant argued, inter alia: "Your Honor, if you will, I don't think it has been established that it is work product. And, in fact, I even requested any retainer agreements to ascertain who the contract was between, whether it was the plaintiff or plaintiff's counsel's firms." After hearing argument from both attorneys, the court ruled: "I had an opportunity to take a look at the rules that apply and having listened to the argument of counsel, I'm persuaded by the plaintiff's position, so I'm not going to order the turnover of the information. So that request is denied." The plaintiff proceeded to present the testimony of Hoffman as his expert witness.[16]

In its memorandum of decision dissolving the parties' marriage, the court set forth the following facts pertaining to the marital residence. "After their marriage, the parties purchased 9 Boyd Lane in Greenwich for $450,000, demolished an existing structure on the property and built what became the marital residence. The parties secured a construction loan and the plaintiff contributed approximately $350,000 in cash to the project, which amount was the total of an inheritance from his great grandmother and gifts from his parents. At trial, both parties introduced expert testimony as to the value of the marital residence, which is the main asset of the marriage. The plaintiff's expert, [Hoffman], is a real estate broker who prepared a market analysis and testified that the property's value as of April 11, 2022, was $1,659,367.50, an increase from the $1,580,350 value he found on February 15, 2022. Hoffman conceded that he is not an appraiser and did not perform an appraisal but based his opinion of value on factors including

---

[16] Tooher prepared two appraisals of the marital residence, which were admitted into evidence. Hoffman prepared a home valuation report of the marital residence, which was admitted into evidence.

relevant sales and his intimate familiarity of the River-side neighborhood in which the property is located. The defendant's expert, [Tooher], has been a licensed real estate appraiser for thirty-six years and obtained his [Senior Residential Appraiser] designation in 1994. Tooher concluded that the value of the property was $1,160,000 as of June 9, 2021. Tooher further testified that the real estate market in Greenwich had increased since that date, but he did not provide an updated opinion of value. The defendant also testified to the below average condition of the marital residence, including electrical and mold issues. Based on the credible evidence in the record, the court finds the fair market value of the marital residence to be $1,400,000, which is the approximate midpoint between the experts' opinions of value.[17] The property is encumbered by a first mortgage and a home equity loan with a combined total outstanding balance of approximately $1,098,000."[18] (Footnote in original.)

On appeal, the defendant claims that the court improperly denied her request to obtain a copy of the appraisal performed by Correll, "despite the requirements of full disclosure in marital dissolution cases." Specifically, the defendant argues that, "even if the appraisal could be withheld in a civil action, marital dissolution cases have unique case law and rules of procedure that require 'full and frank disclosure'

---

[17] "Also in the record is the Greenwich Tax Assessor's card, which assigns the property a preliminary fair market value of $1,412,200 as of October 1, 2021. While the court assigns this value less weight than either of the experts who testified at trial, it does provide some indication of value."

[18] Tooher performed an updated appraisal, which was admitted into evidence and valued the marital residence at $1,265,000 as of February 7, 2022. We agree with the defendant that the trial court's finding that Tooher did not provide an updated opinion of value was erroneous, but because that value was higher and closer to the value found by the trial court, the defendant was not harmed by this error.

between the parties.[19] Most notably, Practice Book § 25-32[20] makes it mandatory for a husband and a wife in a dissolution action to exchange 'any written appraisal concerning any asset owned by either party,' and it imposes a continuing duty of such disclosure throughout the case."[21] (Emphasis omitted; footnotes added.)

We first note that the defendant did not assert these arguments before the trial court in either her request for production or at trial. She argued only that the appraisal was not protected as the work product of the plaintiff's counsel but neither cited Practice Book § 25-32 nor argued that she was entitled to "full and frank disclosure." See *State* v. *Alvarez*, 209 Conn. App. 250, 252 n.2, 267 A.3d 303 (2021) (when party makes different argument on appeal than at trial, claim is unpreserved), aff'd, 346 Conn. 530, 292 A.3d 1 (2023).

[19] The defendant also argues that the plaintiff represented to the court in his motion for access to the marital home that he would disclose the appraisal within seven days and he should not have later been permitted to refuse to follow through with that representation. Presumably, the plaintiff made those representations because he was considering introducing into evidence at trial the appraisal and was seeking to assure the defendant that she would have access to the appraisal before trial resumed. Because the plaintiff did not seek to introduce the appraisal or the testimony of the appraiser into evidence, the defendant's argument is unavailing.

[20] Practice Book § 25-32, which is entitled "Mandatory Disclosure and Production," provides in relevant part: "(a) Unless otherwise ordered by the judicial authority for good cause shown, upon request by a party involved in an action for dissolution of marriage or civil union, legal separation, annulment or support, or a postjudgment motion for modification of alimony or support, opposing parties shall exchange the following documents within sixty days of such request: . . .

"(8) any written appraisal concerning any asset owned by either party.

"(b) Such duty to disclose shall continue during the pendency of the action should a party appear. This section shall not preclude discovery under any other provisions of these rules."

[21] The defendant also argues on appeal that the appraisal did not qualify as work product under Practice Book § 13-3. This argument misses the mark in that the plaintiff did not object to the disclosure of the appraisal on the basis of § 13-3, and the court's denial of the defendant's request for production was not based on § 13-3.

Moreover, the defendant fails, in her appellate arguments, to address the basis upon which the court denied her request for production. In objecting to the defendant's request for production, the plaintiff unambiguously argued that the appraisal was protected from disclosure under Practice Book § 13-4 (f) because he had not disclosed Correll as an expert witness, was not intending to call him to testify as a witness and would not seek to introduce the appraisal into evidence, and the court expressly agreed with the plaintiff's argument. The defendant did not contest the applicability of Practice Book § 13-4 (f) before the trial court, nor has she done so in her brief to this court. Indeed, her brief to this court is devoid of any mention of Practice Book § 13-4 or any analysis as to why Practice Book § 25-32 would trump Practice Book § 13-4, particularly in light of the express application of Practice Book § 13-4 to family cases through Practice Book § 25-31.[22] In the absence of a proper challenge to the basis of the court's ruling, namely, that the appraisal was protected from disclosure by Practice Book § 13-4 (f), the defendant cannot prevail on her claim that the court abused its discretion in so ruling.[23] See *OneWest Bank, N.A.* v.

[22] Practice Book § 25-31 provides in relevant part that "the provisions of Sections 13-1 through 13-10 . . . shall apply to family matters as defined in Section 25-1." We do not reach the issue of whether Practice Book § 25-32 trumps Practice Book § 13-4 (f) or vice versa because the defendant did not raise it before the trial court and likewise failed to brief it to this court.

[23] Although we need not reach the issue of whether the defendant was harmed by the court's denial of her request for the appraisal, we note that her reliance on our Supreme Court's decision in *Ramin* v. *Ramin*, 281 Conn. 324, 915 A.2d 790 (2007), for the proposition that she need not prove harm is misplaced. Our Supreme Court has explained that, "even in the marital dissolution context, *Ramin* does not establish a general rule. Over the course of the proceedings in *Ramin*, the plaintiff filed five motions for contempt in response to which the court issued orders to comply, sanctions and attorney's fees against the defendant. . . . The defendant's persistent failure to produce specifically requested documents prompted this court to describe his conduct as egregious litigation misconduct . . . . We expressly recognized that the particular facts of *Ramin*, because of the defendant's egregious misconduct, required a departure from the ordinary rule. *Ramin*,

*Ceslik*, 202 Conn. App. 445, 456–57, 246 A.3d 18 ("[t]he defendant's claim is not persuasive because, even if it has merit, it does not undermine the ground on which the court based its decision"), cert. denied, 336 Conn. 936, 249 A.3d 39 (2021).

IV

The defendant finally claims that the court "erred in its property orders by inequitably favoring the [plaintiff] with an excessively high portion of assets, while assigning [the defendant] minimal assets and unreasonable amounts of debt and liabilities." We disagree.

The following legal principles guide our analysis of the defendant's claim. "In dissolution proceedings, the court must fashion its financial orders in accordance with the criteria set forth in . . . § 46b-81 (division of marital property) . . . . Pursuant to § 46b-81 (c), the court shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. *The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates. . . .*

"While the trial court must consider the delineated statutory criteria . . . no single criterion is preferred over others, and the court is accorded wide latitude in

therefore, represents a narrow exception to the general rule that the party claiming error bears the burden to demonstrate harm." (Citations omitted; internal quotation marks omitted.) *Duart* v. *Dept. of Correction*, 303 Conn. 479, 502, 34 A.3d 343 (2012). Because there was no misconduct by the plaintiff here, we cannot conclude that this case falls within the narrow exception carved out in *Ramin* relieving an appellant from proving harm.

varying the weight placed upon each item under the peculiar circumstances of each case. . . . A trial court . . . need not give each factor equal weight . . . or recite the statutory criteria that it considered in making its decision or make express findings as to each statutory factor. . . .

"Importantly, § 46b-81 (a) permits the farthest reaches from an equal division as is possible, allowing the court to assign to either the husband or wife all or any part of the estate of the other. . . . On the basis of the plain language of § 46b-81, there is no presumption in Connecticut that marital property should be divided equally prior to applying the statutory criteria. . . . Additionally, [i]ndividual financial orders in a dissolution action are part of the carefully crafted mosaic that comprises the entire asset reallocation plan. . . . Under the mosaic doctrine, financial orders should not be viewed as a collection of single disconnected occurrences, but rather as a seamless collection of interdependent elements. . . . [W]e will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Pencheva-Hasse* v. *Hasse*, 221 Conn. App. 113, 129–30, 300 A.3d 1175 (2023).

"[W]hen a trial court states in its memorandum of decision that it has considered the factors listed in § 46b-81 (c) in fashioning an order distributing marital property, the judge is presumed to have performed [his or her] duty unless the contrary appears [from the record]." (Internal quotation marks omitted.) *Kammili* v. *Kammili*, 197 Conn. App. 656, 672, 232 A.3d 102, cert. denied, 335 Conn. 947, 238 A.3d 18 (2020). Thus, because the court in this case specified in its memorandum of decision that it considered the criteria set forth

in § 46b-81 and the evidence before it, it is presumed at the outset to have properly performed its duty in distributing the marital estate.

We nevertheless address the defendant's specific arguments in support of her claim that the court's division of property was inequitable. The defendant argues that, "[m]ost notably, [the plaintiff] was given all of the parties' retirement assets" and that she "did not receive a single dollar of retirement funds." In so arguing, the defendant ignores the fact that she did, in fact, receive a large portion of her retirement funds when she unilaterally withdrew almost $80,000 from her retirement accounts, for which she never fully accounted. By ordering the defendant to transfer the remaining funds in her accounts to the plaintiff, the court likely was striving to offset the defendant's earlier withdrawal. It was not improper or inequitable for the court to do so.

The defendant also complains that, although the court ordered that the proceeds from the sale of the marital home be split equally, the amount of those proceeds was unpredictable in that "[i]t is quite possible that selling the house could leave nothing for [her]," depending on the sale price of the property. To some extent that unpredictability is unavoidable in that neither the parties, their expert witnesses, nor the court can control the actual sale price of the property. The defendant does not, however, suggest how an alternative division of the marital residence, short of simply awarding it to her in its entirety, might alleviate that unpredictability.

Moreover, as noted herein, the court found that the plaintiff contributed $350,000 to the purchase of the marital residence, which he had received as an inheritance from his great grandmother and a gift from his parents. The court also found that the defendant wilfully and unilaterally violated the court order that she pay

the mortgages on the marital residence during the pendency of the action, and, because she did so, "that deferral amount [of $87,961.45] must be paid off as a balloon payment at the end of the mortgage term or earlier payoff." Despite those findings, which would tend to favor a split more advantageous to the plaintiff, the court nevertheless reasonably exercised its discretion in ordering that the proceeds of the sale of the marital residence be split equally.[24] The court's order that the proceeds from the sale of the marital residence, which, on the basis of the record before the trial court, was the most significant asset of the parties' marriage, be split equally belies the defendant's contention that the court awarded the "vast majority" or "virtually all" of the parties' assets to the plaintiff.

Finally, the defendant argues that the court inequitably ordered her to pay the remaining debt on the parties' two joint credit card accounts, which, pursuant to the December 16, 2019 pendente lite orders, the plaintiff had been paying. In making those payments, the plaintiff reduced the parties' joint debt by almost $16,000. Meanwhile, the defendant paid off approximately $70,000 of her sole debt while this action was pending. Considering its order that the proceeds from the sale of the marital residence would be shared equally, despite the defendant's failure to abide by her pendente lite obligations,

---

[24] The court also found that "[t]he parties also own a Marriott timeshare, which the plaintiff values at $5000 and to which the defendant ascribes two different values on her most recent financial affidavit, $45,000 and $20,527. The parties have tried to sell the timeshare in the past without success. Given these facts, the court finds the value of the timeshare to be $5000." Although the record does not support the court's finding that the plaintiff valued the timeshare at $5000, the defendant testified at trial that the annual fees for the timeshare were $3000 and that the parties had unsuccessfully tried to sell it and she was not sure they would get even $20,000 for it when they did sell it. That was the entirety of the evidence of the value of the timeshare presented by the parties. On the basis of the scant evidence of the timeshare's value presented by the parties, we cannot conclude that the court's valuation was erroneous.

the court again was striving to offset the financial ramifications of the defendant's unilateral reductions of the marital estate. Moreover, we note that the court found that the defendant has a higher earning capacity and higher income than the plaintiff, either or both of which would have justified an order that the defendant pay alimony to the plaintiff. Despite the plaintiff's request for alimony, the court did not issue such an order.

As noted herein, "[t]here is no set formula the court is obligated to apply when dividing the parties' assets and . . . the court is vested with broad discretion in fashioning financial orders." (Internal quotation marks omitted.) *Kent* v. *DiPaola*, 178 Conn. App. 424, 441–42, 175 A.3d 601 (2017); see also *Sapper* v. *Sapper*, 109 Conn. App. 99, 107–108, 951 A.2d 5 (2008) (courts are not bound to use specific formula and are not required to ritualistically recite statutory criteria considered in dividing marital assets). The court thoughtfully and carefully considered the testimony, exhibits and relevant statutory factors in dividing the marital property. Given the entire mosaic of the court's judgment, we are not persuaded by the defendant's argument that the court's orders were inequitable. Accordingly, we disagree with the defendant that the court abused its discretion with respect to the division of the marital estate.

The judgment is affirmed.

In this opinion the other judges concurred.